PEOPLE'S GAS AND ELECTRIC COMPANY OF OSWEGO,
N. Y., Plaintiff, *v.* THE CITY OF OSWEGO, JOHN FITZ-
GIBBONS, as Mayor of the City of Oswego, JOHN D.
HIGGINS, DAVID P. MOREHOUSE, THOMAS H. KING,
WILLIAM J. DOWDLE and FRED M. RILEY, as Com-
missioners of Water Service of the City of Oswego,
N. Y., Defendants.

(Supreme Court, Oswego Special Term, July, 1919.)

Injunctions — when motion to set aside, pendente lite, denied —
    municipal corporations — taxpayer's action — General Munici-
    pal Law, § 51 — Code Civ. Pro. § 1925.

    Where the city of Oswego, in exchange for its right to use
    one-half of the waters impounded by the barge canal dam No. 6,
    etc., agrees with and is about to execute and intends to deliver
    to the state of New York certain releases which will, in effect,
    relieve the state from any liability to the city because of any

and all claims growing out of the taking or occupation heretofore of lands belonging to the city or its predecessors in title for temporary or permanent canal uses or purposes, etc., and a taxpayer's action is brought under section 51 of the General Municipal Law and section 1925 of the Code of Civil Procedure to restrain the city from carrying out such compromised settlement of its said claims, which arose out of the construction of the improved Oswego canal, on the ground that so to do would be illegal and result in a waste of public funds and in the city parting irrevocably with valuable claims against the state for substantially no consideration, and it appears that the basis of the action rests not on a claim of any personal corrupt motives of any of the city officials, but upon the ground that the proposed action is so unwise as to amount to an abuse of discretion and fraught with such possibilities of injuries to the city as to amount to bad faith and fraud, a motion to continue an injunction *pendente lite* will be granted and a motion to set the same aside will be denied.

RETURN of an order to show cause why a preliminary injunction granted to the plaintiff should not be continued, pending the trial of the action.

George N. Burt (Harry C. Mizen, of counsel), for plaintiff.

Purcell, Cullen & Purcell (Francis E. Cullen and D. P. Morehouse, of counsel), for defendants.

Ross, J. This is a taxpayer's action under the authority of section 51, General Municipal Law, and section 1925, Code of Civil Procedure. The plaintiff seeks to restrain the defendants, the city of Oswego, John Fitzgibbons, as mayor of said city, and the other defendants, constituting the water service commission of the city of Oswego, from consummating a compromise and settlement of certain claims of the city of Oswego against the state of New York, arising out of the construction of the improved Oswego canal. It is asserted by the plaintiff that the action on the part of the defendants to carry such a compromise into

effect is illegal, and will result in a waste of pub-
lic funds and property belonging to the city of
Oswego, and will result in the city of Oswego parting
irrevocably with valuable claims against the state of
New York for substantially no consideration; that
said action is such an abuse of discretion upon the
part of the defendants, the city officials, as to con-
stitute bad faith.

By the aforesaid proposed agreement the city of
Oswego, in exchange for the right to use one-half of the
waters impounded by barge canal dam No. 6, over and
above the amount of flow of water now or hereafter
required for any and all canal uses and purposes,
together with the right to said city to draw through
the bulkhead gates of said dam and to pass over any
intervening state structure or lands said surplus waters,
and the right to attach to the said dam and bulkhead
such race or forebay walls as are necessary to enable
said city to use said surplus water, the said state of
New York retaining control over the said dam and
the appurtenances thereto, and the power to regulate
and control the flow of water therefrom; said city of
Oswego agrees to and has executed, or is about to
execute, and intends to deliver to the state of New
York, a release or releases which, in substance,
relieves the state from any liability to the said city
of Oswego of and from any and all claims growing
out of the taking or occupation heretofore of lands
belonging to the said city of Oswego or its prede-
cessors in title for temporary or permanent canal
uses or purposes, and included particularly four
claims heretofore filed by said city of Oswego with
the board of claims of the state of New York against
said state, more particularly described as follows:
For permanent appropriation of lands, buildings,
structures, riparian rights, water rights, etc., $3,150,-

Supreme Court, July, 1919.          [Vol. 108.

500; for destruction of buildings, machinery, equipment and loss of use of water power, $80,000; for permanent appropriation of land upon which bulkhead is constructed, embracing a part of the northerly 167 feet of parcel No. 2800-A, aforesaid, $1,002,000; for other lands, not embraced in last above claim, $6,600; total, $4,239,100.

The decision of Judge Vann in the case of *Carroll v. Oswego* that the city of Oswego has the right to use one-half of the surplus flow of the Oswego river on the westerly side thereof, is based upon the theory of an agreement by and between certain officials of the state of New York and of the city of Oswego, never reduced to definite terms, but arising by reason of acts of said officials, and expenditures of money by said city in reliance thereon, by which the city's rights in the high dam were transferred to the new dam No. 6. Whether such an equitable conveyance of the state's rights could be legally made is not presented in this action. If the state had been a party to that action, and the same result obtained, there would be no necessity for this action. The gravamen of this action is whether the proposed action of the state, in conveying the right to use one-half of the surplus waters impounded by dam No. 6, is violative of the provisions of section 16 of the Barge Canal Law (Laws of 1903, chap. 147), and if such action is illegal, it must follow that the city of Oswego would part with its claims against the state of New York without any substantial consideration.

A further reference to the proceedings had in the *Carroll* case is instructive. In that case the people of the city of Oswego had voted to bond the city in the initial amount of $345,000 for the purpose of utilizing the surplus water which it was claimed the city of Oswego owned. Upon the proof presented upon the

action for a temporary injunction, it was extremely probable that the total expense of the proposed undertaking would cost the city of Oswego an amount greatly in excess of the initial amount above named. Suppose that the injunction had been dissolved and the bonds had been issued and the enterprise begun, can anyone doubt in view of the subsequent utterances of the Hon. Merton E. Lewis, former attorney-general of the state of New York, and the veto of the present governor of the state of the Ramsperger bill hereinafter referred to, that the city of Oswego would not have progressed appreciably in the enterprise, when it would have met with a determined and at least, for the moment, a successful effort on the part of the State to prevent a continuation of its enterprise. I quote from the language of former Attorney-General Lewis on the argument before the committee of the canal board on March 19, 1919, on page 24 of the stenographer's minutes: " I contend that the grant of land asked for by the city, carrying with it, as it would, the right to connect with the bulkheads constructed by the State, and the right to take the waters which have been impounded by the construction of this dam, would be a violation of section 16 of the Barge Canal Law. I contend that it would be null and void, and that it might be set aside by any court having jurisdiction in an action brought in the name of the people of the state."

So that instead of a litigation to determine whether the city of Oswego had the authority and the right to use the surplus waters in the method contemplated, it would have had to determine that question after it had sold its bonds. The money received therefrom would have presumably been lying idle in the banks, with the probability of liability arising upon outstanding contracts with experts, engineers, architects and con-

tractors; and the only thing that would have been certain would have been the liability of the city of Oswego upon its bonds, together with an interest charge of approximately $15,000 a year. The Carroll litigation proceeded to trial before Judge Vann, as referee, and no abler jurist could have been selected, none in whose opinion I have greater confidence, and he sustained the contention of the plaintiff, and from the judgment entered upon his report no appeal was taken. The opinion in the *Carroll* case is an opinion of an able jurist, but, except as an opinion, only binds the parties to that action. It would seem to be wise if the city of Oswego before becoming liable for a large amount of money, would ascertain to a certainty its rights to use the water in question.

I have in mind the principles laid down in the case of *Talcott* v. *City of Buffalo,* 125 N. Y. 280, that the courts must not interfere with the discretion of local officers and municipal bodies, and that they must not attempt to manage the affairs of a municipal corporation.

As stated in the case of *Ziegler* v. *Chapin,* 126 N. Y. 342, 349, by Finch, J., writing for the court: "The legislature could not have intended that the courts should supply intelligence and prudence to incapable officials at the demand of a taxpayer, but manifestly did intend to give the latter protection against the dishonesty or fraud of the municipal agents." This case also holds that an action will lie to restrain municipal officials who have no authority to act; in the instant case, whether the city of Oswego receives the rights which the state officials purport to give it, depends entirely upon the authority of the latter to act, and if they possess no authority to make the proposed release and quitclaim, there would be a substantial failure of consideration for the release of

the large claims possessed by the city of Oswego against the state of New York and any subsequent action thereon would be rendered impossible, with other reasons, because of the running of the Statute of Limitations, so that the basis of this action rests, not upon the claim of any personal corrupt motives of any of the city officials, but that, under the circumstances, the proposed action is so unwise as to amount to an abuse of discretion, and fraught with such possibilities of injury to the city of Oswego as to amount to bad faith and fraud. To state it in different language, this injunction is not an attempt to exercise the discretion resting in the officials of the city of Oswego, but to restrain an abuse of such discretion.

It is claimed by the plaintiff that the superintendent of public works, acting for the canal board, has no authority to give to the city of Oswego, or to sell to said city, or to exchange for other property or claims belonging to said city of Oswego, the right to use the whole or any part of the waters impounded in dam No. 6. Section 16 of the Barge Canal Law (Laws of 1903, chap. 147, amended by Laws of 1907, chap. 494) reads as follows: " The waters, surplus or otherwise, created or impounded as a result of the improvement of the Erie, Champlain and Oswego canals, pursuant to the provisions of this act, or from the construction of any dam or dams, mole or moles, reservoir or reservoirs, or other structures, connected therewith, shall not be leased, sold or otherwise disposed of, until the improvement of said canals as contemplated in this act, and amendments thereto, shall have been finally completed, nor thereafter until authorized by statute setting forth specific terms, conditions and restrictions governing the same." This section was amended by chapter 38, Laws of 1919, but retained the language of the act of 1907.

The petition of the city of Oswego to the canal

board, dated February 10, 1919, asks for the following relief, after asking for the execution and delivery of a quitclaim deed by the superintendent of public works for and in behalf of the state of New York to the city of Oswego, continues: " That said deed shall also quitclaim to the City of Oswego the use of the waters of the Oswego River impounded by said dam No. 6, and the right of flowing the same through the headgates of the dam as at present or hereafter constructed, and over the lands so conveyed, to the extent of the interest therein, if any, vested in the State of New York.  *  *  * "

The committee appointed by the canal board, to which said petition was referred, in its report to the canal board on March 21, 1919, prepared for the consideration of the canal board a proposed release, which said report stated that the deed, if adopted, would operate to invest the city of Oswego with the title to the portion of the property appropriated " together with the right to the use for power purposes of one-half of the surplus waters impounded by said dam, with the right to attach its power structures to said dam." Thereupon, the aforesaid canal board adopted a resolution on or about the 2d day of April, 1919, which contained, with other things, the following:

" *Resolved,* that the Superintendent of Public Works be, and he hereby is, directed to execute and deliver to the City of Oswego, a quit claim deed or deeds, approved as to form by the Attorney General, releasing and conveying to the City of Oswego, the right, title and interest, if any, of the State, in and to the use, at and below said dam, of one-half of the surplus waters of the Oswego River impounded by the said dam (i. e. one-half of the waters impounded by said dam over and above the amount of flow of water

now or hereafter required for any and all canal uses and purposes, including the water which may hereafter be required for the operation of a second lock.)   *   *   *''

Comparing the language of the foregoing instruments in reference to surplus waters with the language of the statute, the common council of the city of Oswego asked for and the canal board authorized, so far as it could, the superintendent of public works to convey what in terms is expressly forbidden by the statute to be conveyed. The inclusion in the petition of the city of Oswego and in the resolution of the canal board, and the deed itself, of the words "if any," does not seem to me to be important. These words can neither enlarge nor diminish the actual interest that the state has in and to the surplus waters, and in this connection it is interesting to note that in the report of the committee appointed by the canal board, no such limitation appears, but it advises a form of resolution which, if adopted by the canal board, will operate to invest the city of Oswego with the right to use for power purposes one-half of the surplus waters impounded, etc. While not controlling, it does not seem reasonable that the common council of the city of Oswego would petition for, and relinquish valuable money rights to obtain, the right to surplus waters which such body did not believe that the state owned and had the right to sell; and that the committee appointed by the canal board to investigate the matter and to report, and the canal board, would direct the superintendent of public works to execute a formal conveyance of something which the state did not own or have the right to convey. The fact that the city of Oswego is to receive by the proposed conveyance other consideration is, in this connection, unimportant, for the fact is that the intrinsic value

of the rights proposed to be conveyed by the state to the city of Oswego is the right to use the surplus waters impounded in dam No. 6, and that, without this right, the grant would be valueless.

There can be no question that the terms of section 16 are very comprehensive, and were intended to protect, in every respect, the right of the state of New York in and to the waters created or impounded as a result of the improvement of the canals, until such canals were finally completed, and " thereafter until authorized by statute, setting forth specific terms, conditions and restrictions governing the same." No claim was made either upon the argument or in the brief of counsel, that the barge canal is completed, and no evidence has been presented that there has been any subsequent authorization by statute setting forth specific terms, conditions and restrictions, but, on the contrary, it was stated by the learned counsel for the plaintiff, and not denied, that a bill was introduced in the state senate April 2, 1919, by Senator Ramsperger (senate print No. 1526) which authorized the canal board to compromise, settle and adjust the claims and demands of water power claimants, and provided by its terms that the canal board might, on such terms and conditions as it deemed just, compromise and adjust the claims and demands of persons and corporations as to ownership of water power or any interest in water power. In other words, the aforesaid bill provided in substance for precisely what it is proposed to do in this case. This bill passed both houses of the legislature and was vetoed by the governor, as I understand, upon the ground that the right to develop this power belongs to the state of New York and not to the city of Oswego. This is referred to in this connection only for the purpose of showing that evidently in the judg-

ment of the members of the two houses of the legislature they deemed such legislation necessary to confer power upon the canal board.

There can be no question that the state of New York has the right to use, if required for canal purposes, all of the water in the Oswego river, and the purpose of this section was to protect that right. In other words, this act not only forbids the sale of what is termed " surplus water " which goes to waste, but is intended also to protect the right of the state in and to all of the waters created or impounded.

Stripped of all verbiage, what the city of Oswego seeks is the right to use all or a portion of the surplus water impounded in dam No. 6. This is what the state proposes to convey. The other transfers in the proposed conveyance by the state are simply incidental and necessary to enable the city of Oswego to use said surplus water. The state, at present, is willing to sell such water. Section 16 of the Barge Canal Act seems to forbid such sale, and if the apparent meaning of section 16 is its actual meaning, then the city of Oswego would part with valuable claims (probably not as valuable as claimed in the notices filed, but of substantial value), like Esau of old, who sold his birthright for a " meal of bread and pottage."

The defendants contend that the provisions of section 16 of the Barge Canal Law forbidding the sale or lease or disposition of surplus waters of the canal do not apply to this case, for the reason that, it is claimed, the state owns no property in such surplus waters. In this connection, I quote from the stenographer's minutes of the proceedings before the committee of the canal board on March 19, 1919. " The State Engineer: Are you quite clear that the State has no title in any surplus waters? Mr. Cullen: Yes. Mr. Williams: Then why do you ask the Canal Board

in this conveyance to convey them to you? Mr. Cullen: I will come to that in just a minute, Mr. Williams. * * * In 1839, I think that I recall the date correctly, the Vice Chancellor of the State, speaking of the contention that the State owned the surplus waters of the canal, said that that question had already been so entirely and perfectly settled that it was impossible that it could be raised again. That, I think, was in 1839, when the Vice Chancellor made that statement, and his opinion upon that subject was affirmed by the Chancellor. Ever since that time the State has continued to insist that it does own that title. * * *"

Mr. Cullen further stated upon said hearing, as appears by the stenographer's minutes: "Now the first consideration that comes to one's mind upon that section (referring to section 16, Barge Canal Law), is that it must refer to waters that the State actually owned; that if the State does not own certain waters, then that section 16 does not apply to those waters. That is so rudimentary that it requires no more than the statement of the proposition for its demonstration. * * *" But, as forceful and able as Mr. Cullen presented the contention of the defendants, it is somewhat too forceful and somewhat misleading.

In the case of *Varick* v. *Smith,* 9 Paige, 560, the vice-chancellor used this language: "Was the water accumulated in that dam, from the moment it passed over the top of the dam and in its descent to the bed of the stream below the dam, necessary for the supply of the Oswego canal? On the contrary, the moment it commenced its descent it was incapable of being appropriated to that purpose, and it had ceased to be consecrated to the public use. It had become physically impossible to appropriate to such use. The public property in it had ceased to exist; and in my judg-

ment, the right of the riparian owner, which had been suspended, revived and reattached to it in full force, subject to no restriction, except that servitude to public interest, for the' general purposes of navigation, which existed before the erection of the dam.''

And again the vice-chancellor states (p. 561): '' The government has the power, under the constitution, to appropriate the private property of its citizens, just so far and no farther than is necessary for the purpose and object of the appropriation; and that may be an absolute and exclusive right to land or water, or it may be a partial or common or usufructuary right, according to the nature of the property and the circumstances of the case. But when such purpose is accomplished, the right of the state is exhausted, and the whole of the residue of the property, whatever it may be, belongs to the citizen. * * * The state, therefore, may lawfully appropriate the property of the individual owner to this extent, by making proper provision for compensation for the damages sustained. Beyond this, I apprehend the power of the government does not extend; and all the right to the property, or to the use of it, which is not thus appropriated, may be enjoyed by the original owner of it or by his grantee.''

To understand the *Varick* case, it is necessary to have in mind the fact that in that case the water was actually taken from the dam and then returned to the river a long distance down stream. This was taken down through a combination navigation and power canal, and it was the contention of the complainant that such diversion or use of the water destroyed or seriously impaired the rights of the intervening riparian owner; but, as stated by Judge Fennell of the Court of Claims, in the case of *Bulger* v. *State of New York,* 18 Court of

Claims, 6, 23; 15 State Dept. Rep. 2, 35, referring to the *Varick* case: "There is nothing in this holding inconsistent with the State's using or leasing such surplus water on its dam, provided the water was discharged from the wheels or the dam immediately into the river below the dam, and did not interfere with the riparian rights of any lower owner."

In the case of *Kaukauna Water Power Co.* v. *Green Bay & Mississippi Canal Co.*, 142 U. S. 254, in which case was presented the question of the power of the state to lease surplus water to private individuals when the same is a mere incident to the public improvement, on page 275, Justice Brown, writing for the court, says: "The true distinction seems to be between cases where the dam is erected for the express or apparent purpose of obtaining a water power to lease to private individuals, or where in building a dam for a public improvement, a wholly unnecessary excess of water is created, and cases where the surplus is a mere incident to the public improvement and a reasonable provision for securing an adequate supply of water at all times for such improvement. No claim is made in this case that the water power was created for the purpose of selling or leasing it, or that the dam was erected to a greater height than was reasonably necessary to create a depth of water sufficient for the purposes of navigation at all seasons of the year. So long as the dam was erected for the *bona fide* purpose of furnishing an adequate supply of water for the canal and was not a colorable device for creating a water power, the agents of the State are entitled to great latitude of discretion in regard to the height of the dam and the head of water to be created; and while the surplus in this case may be unnecessarily large, there does not seem to have been any bad faith or abuse of the discretion on the part

of those charged with the construction of the improvement. Courts should not scan too jealously their conduct in this connection if there be no reason to doubt that they were animated solely by a desire to promote the public interests, nor can they undertake to measure with nicety the exact amount of water required for the purposes of the public improvement. Under the circumstances of this case, we think it within the power of the State to retain within its immediate control such surplus as might incidentally be created by the erection of the dam.''

As stated by Judge Fennell in the case of *Bulger* v. *State of New York, supra:* '' Therefore, it seems very clear that the language used by Vice Chancellor Gridley, above quoted, could not mean that the riparian owner next below the dam could have any rights in the water which would interfere with the State's control by removable crests, gates or otherwise, but that, on the contrary, he meant that when once the State had actually discharged the water either over the crest or through the gate or in any manner from the dam, thus actually and physically letting go of it for State purposes, it could not assert any further rights as against any riparian owner, and, because it could not assert any further rights, it could not actually take such water from above or near its dam and divert it around and away from the property of the next riparian owner.''

It is also to be borne in mind that if the court should dissolve the temporary injunction, the threatened release of the rights of the city of Oswego will undoubtedly be executed, and the city of Oswego will have dispossessed itself of its rights in this regard, and whatever further steps the plaintiff may take cannot in that event undo the action which is herein restrained. On the other hand, if the temporary

injunction is continued, there is no reason why a trial cannot be had in time to have a decision and bring the issues before the next term of the Appellate Division of this department. This is not only a practical view of the situation, but is in accordance with authorities that, when a temporary injunction goes to the merits of the case, and its dissolution would end the case, the court should hesitate to dissolve a temporary injunction.

In *Young* v. *Rondout & Kingston Gas Light Co.,* 129 N. Y. 57, 60, Finch, J., says: " To dissolve an injunction with the inevitable result of defeating plaintiff's remedy without a trial, we must be entirely satisfied that the case is one in which by settled adjudication the plaintiff, upon the facts stated, is not entitled to final relief."

*Colby* v. *Equitable Trust Co.,* 55 Misc. Rep. 355, a decision by Blanchard, J., at Special Term. The language of the judge on page 366 is applicable to this case: " Unless the *status quo* of this case can be preserved the relief which the plaintiff prays for, and which upon the trial he may prove to be entitled to, will be irrevocably lost by reason of the merger of the defendant corporations and the extinction of The Equitable Trust Company."

The papers presented here are voluminous and it may be said in a general way that, while the facts are not in dispute, the inferences and conclusions drawn by the respective litigants are as varied as the varying points of the compass, and it would seem to be self-evident that a matter of the importance that is herein involved should not be determined upon affidavits, but only upon a careful trial in which witnesses are produced and evidence introduced.

The situation in which the court finds itself in this case is not unlike the situation frequently presented

in an application for a certificate of reasonable doubt in a criminal case; the judge is not called upon to decide the case, but he is called upon to determine whether the defendant in the case supposed has presented facts sufficient to justify a further and careful determination of his rights.

The order to be entered hereon will provide that the plaintiff increase the security heretofore given to the sum of $2,500, and such further direction as to insure that the trial of this case will not be delayed by the plaintiff. The plaintiff, in its brief, has stipulated to go on with the trial of this action before the court, or before a referee appointed by the court or agreed upon by the parties, upon ten days' notice after the case is at issue. This stipulation is not sufficiently explicit, as there might be considerable delay in reaching a trial, even under this stipulation. The respective attorneys probably will agree upon a course of procedure. If not, the order to be entered hereon can be settled upon two days' notice.

Motion to continue temporary injunction granted, and motion to set aside the same denied.

Ordered accordingly.