Ackerson, P. J.
The trial of this claim was commenced in this court in January, 1917. The trial was continued from time to time until January 9, 1918, when the attorneys for the respective parties hereto *15 united in submitting to the court for decision, before further proceeding with the trial, two preliminary questions, as follows:
First. As to whether or not the so-called waiver and release of April 14, 1910, which is an exhibit in this case, is a valid instrument, and if so, the operation and the legal effect of that instrument; and
Second. The question as to the nature and extent of claimant’s water rights and privileges at this time.
The court thereupon acceded to the said joint request of counsel, and requested them to file briefs covering the law and facts necessary to be considered by the court in passing upon the two questions so submitted for decision. The respective counsel complied with the court’s request in this regard, and such briefs were all filed with the court in February, 1919.
We consider it proper for a thorough understanding of the questions before us, to briefly review the history of this claim and of the state’s operations at Minetto; also to consider the rights of the claimant and its predecessors in and to the bed and water of the Oswego river at Minetto before and since the building of the Oswego canal and down to the time immediately prior to the commencement of Barge canal construction at Minetto in about 1910. Also to consider what effect the state appropriations and Barge canal construction in the Oswego river at Minetto since 1910 had upon the rights of this claimant and its predecessors as they existed immediately prior thereto, wholly independent of and without reference to the so-called release and waiver of April 14,1910. Then we will answer directly the two questions submitted to us by the counsel for the respective parties hereto in accordance with the law applicable to the facts and circumstance's of this case as we understand the same to be.
The counsel for the state at the commencement of his brief makes an excellent statement concerning the *16 nature and extent of the claim herein from which we quote as follows:
“ This is a claim originally filed December 24, 1912, by the Minetto Meriden Company in its own right, and in the name of the Minetto Shade Cloth Company, for the use of the Minetto Meriden Company.
“August 5, 1916, pursuant to an order of this court, dated August 5, 1916, the claim was amended by substituting The Minetto Meriden Company, The Columbia Mills, Inc., and the Northern New York Power Corporation as claimants in place of The Minetto Meriden Company.
“April 23,1917, this court granted an order permitting the Northern New York Power Corporation to file an amended and supplemental claim and on the 30th day of April, in alleged conformity with said order, an amended and supplemental claim was filed by it in place of the original claim No. 726-A; and this amended and supplemental claim is the claim now on trial.
“ While the claim now before the court is based upon appropriations made pursuant to the provisions of the Barge Canal Law by maps Nos. 2878 and 2910-A, the claim, broadly speaking, grows out of (a) the appropriation by the State, pursuant to the provisions of Chapter 147 of the Laws of 1903, of parcels of land delineated and described on appropriation maps Nos. 2877, 2877-A, 2878, 2910, 2910-A and 3993 (all of which parcels and property.appropriated by which maps, the claimant and its predecessors in interest claim to have been the owners), and (b) the construction by the State of canal dams known as Nos. 5 and 6.
“As hereinafter pointed out, the claims growing out of all of the said appropriations, except the appropriations effected by maps Nos. 2878, 2910 and 2910-A, have been adjusted (assuming the deed of December 17, 1914, is not avoided) and therefore do not figure ! directly in the disposition of this claim.
*17 “ Briefly stated, the amended claim alleges (so far as we consider it material), in substance, that at the time of the making of the appropriations effected by maps Nos. 2878, 2910 and 2910-A claimant’s predecessor in title and assignor, the Minetto Shade Cloth Company, was the owner in fee simple of a certain tract of land (described in Ex. A, p. 25 of the claim and graphically shown on Ex. B, p. 37 of the claim), in the village of Minetto, Oswego county, N. Y., on the west bank and in the bed of the Oswego river; that within the limits of said property there were rifts and a natural fall in the river; that for many years the State had maintained in the river opposite the said uplands a canal dam, known as the Minetto State Dam, with fixed crest at 297.3 Barge Canal datum; that claimant’s predecessors in title had for many years owned, maintained and operated a hydraulic or hydro-electric plant on their said premises in the bed of the river, immediately north of and adjacent to the bulkhead at the west end of the aforesaid State dam and thereby obtained from the use of the surplus waters of the river power for the operation of their mills and factories located upon the bank, the water being drawn through bulkhead openings in the west end of the State dam; that at the time of the appropriations herein referred to the Minetto Shade Cloth Company was operating, upon the west upland at the end of the said State dam, a shade cloth factory, deriving its motive power from said hydro-electric plant.
“ It alleges that at the time of the appropriations herein referred to it was practical and feasible, by means of a private dam and works located on its property in the river bed to the north of the State dam, without interfering with the State’s canal works or with navigation, to develop the hydraulic power of the said river, within the hounds of its property, and *18 to use for that purpose the entire surplus flow of the river; and that the property owned by the Minetto Shade Cloth Company at the time of the said appropriations included as an appurtenance the exclusive right to the entire surplus flow of the Oswego river, either at the then existing Minetto State Dam or elsewhere within the boundaries of its property, for the development of hydraulic power and for other purposes, subject only to such limited rights as the State of New York then had to use a portion of said waters for the purpose of the Oswego Canal, as enlarged in 1854.
“ It further alleges that about the year 1910 the State, proceeding pursuant to the provisions of Chapter 147, Laws of 1903, adopted a comprehensive scheme or plan, which has since been carried into effect, for the improvement of the navigation of the Oswego river between the cities of Fulton and Oswego, which scheme or plan involved the destruction of the then existing Minetto State Dam and the construction in lieu thereof, at a point about 100 feet to the south thereof, but opposite the uplands of the Minetto Shade Cloth Company, of a new dam with a fixed crest at 308.0, known as State Dam No. 5, the elimination of the so-called High Dam (with fixed crest at 282.0) located about 12,070 feet to the north of the Minetto Dam and the construction in place thereof, at a point about 4,700 feet to the north thereof, of a new dam, known as State Dam No. 6, with fixed crest at 290.0, and that provision was made in the plans for the said work (embraced in the plans for Barge Canal Contract 37) for a bulkhead on the west end of Dams Nos. 5 and 6, equipped with bulkhead gates, through which the surplus water of the river might be drawn and utilized for the development of hydraulic power.
“ That thereafter the State appropriated certain *19 of the lands and property of the Minetto Shade Cloth Company, considered necessary to effect this improvement, including the appropriations effected by maps Nos. 2878, 2910 and 2910-A.
“ That claimant has succeeded to the title of the Minetto Shade Cloth Company to the lands and interests in lands aforesaid and to its claim for damages growing out of the aforesaid state of facts, and that claimant has been put to large expense and suffered great damage by reason, of the prosecution of the aforesaid improvement, which damages result particularly from the change in the location of the State dam, and the manner of progressing the Barge Canal work resulting in the interruption of the operation of its power plant ahd from changes in its plant necessitated by the change in the elevation of the waters of the river above and below said dam which has necessitated extensive changes and alterations in its manufacturing plant.
“ It alleges that the small upland parcel of land appropriated by map No. 2878 was worth the sum of $4,300 and that the land appropriated by map No. 2910-A was worth the sum of $1,225,000, and that the right acquired by the State to draw from Dam No. 5 the water required for Barge Canal purposes, over and above the water required for the Oswego canal as enlarged in 1854, was worth the sum of $60,000.
“ It alleges consequential damages in the sum of about $246,400.
“ It then sets forth the so-called waiver and release of April 14, 1910, alleging that the claim is filed for the purpose of securing an adjudication as to the validity and effect of said release of damages, and for the purpose of securing and preserving to this claimant its right to prosecute and maintain its said claim against the State of New York in case the State of *20 New York shall hereafter be determined to be the owner of any part of the water impounded at the new Minetto Dam No. 5, not required for the operation of the Barge Canal or for purposes of navigation, and also in ease and to the extent that said instrument shall, at the instance of the State’s representatives or upon the court’s own motion, for any reason whatever be adjudged to be invalid or inoperative.’
‘ ‘ The claim ‘ demands judgment of this court, determining and adjudging:
“ ‘ (1) That the aforesaid appropriations 2910 and 2910-A, in so far as they include land beyond the boundaries of the State dam, bulkhead, lock, guide walls and guide piers, are null and void.
“ ‘ (2) That the claimant is the owner of all of the bed of the Oswego river at the location hereinbefore and at paragraph 8 set forth, not included within the boundaries of the above named State structures and is entitled to use all the water of the Oswego river impounded at said new dam No. 5 not required for the barge canal or purposes of navigation.
“‘(3) That the agreement of waiver and release executed by The Minetto-Meriden Company and dated April 14, 1910, herein marked Exhibit G-, is a valid instrument binding upon the State of New York and the other parties thereto and upon this claimant.
“ ‘ (4) That in case this court should adjudge said agreement of waiver and release, for any reason, invalid, then claimant demands the determination and judgment of the court upon the several items of its above set forth claim, including compensation and damages in full for the aforesaid appropriations 2910 and 2910-A, if the court should adjudge such appropriations valid in their entirety, and, in the event the court should adjudge such appropriations not valid in their entirety, then including compensation and *21 damages for such portion of said appropriations 2910 and 2910-A as the court shall adjudge to be valid.
“‘(5) The claimant demands interest upon the several items of its claim.'
“ In other words, claimant seeks herein either to obtain compensation measured by the value of the property appropriated by maps Nos. 2878, 2910 and 2910-A, together with the consequential damages to its unappropriated property resulting (a) from the aforesaid appropriations, and (b) from the construction and maintenance of State Dams Nos. 5 and 6 and the operation of Lock No. 5, or an adjudication, in substance, that it has a vested and permanent right to the use of the surplus waters of the Oswego river available for use at Dam No. 5, at the head created or rendered available by said dam, with fixed crest at 308.0 and under the physical conditions there existing, in which latter event all its claims for compensation and damages, embodied in this claim, shall be adjudged to have been released under the terms of the aforesaid waiver and release, which was received as Exhibit 126.
“ In effect it seeks a judgment that it is the owner of and entitled to the use of all of the surplus waters of the Oswego river available at the new State Dam No. 5 at the head created or rendered available by said dam with fixed crest at 308.0 (abandoning any claim of right to the maintenance of flashboards) and under the physical conditions there existing; and, in the event that the court so adjudges, it waives all claims to recover damages resulting from the aforesaid appropriations and from the construction, maintenance and operation of State Dams Nos. 5 and 6; but in the event that it is adjudicated that it is not the owner of such water rights, then it demands judgment for the value of said appropriated parcels and the consequential damages resulting therefrom and from *22 the construction, maintenance and operation of the said dams, aggregating, as alleged in the amended claim, about $1,537,014. ’ ’
With this statement concerning the claim and the questions before the court, we no;w proceed to examine the history of the premises in question.
Prior to the commencement of the building of the Oswego canal in 1826 claimant’s predecessors in title owned the land on either side of the Oswego river at the premises in question. It is the claimant’s contention that at this time, on the west side of the river at this point and at or near the present site of claimant’s structure, was a mill operated by water power derived from what is known as a wing dam extending from the westerly bank of the river into and upstream toward the center of the river. For the purpose of deciding the questions now submitted to the court we will assume this to be the fact.
During the construction of the Oswego canal, which was begun in 1826 and completed in December, 1828, the state destroyed the wing dam aforesaid and built a dam directly across the river at that point. This dam was constructed to create a pool above it for slack water navigation and to so raise the elevation of the water at that point as would enable the state to have water at a sufficient elevation to supply the ■canal and locks in a land cut around the easterly end of the dam. This first dam so constructed by the state on these premises had openings at the westerly end thereof to enable claimant’s predecessors in title to use the water which could pass through such openings for power at the head made available by that dam. There were no openings through this original state dam as first constructed except those at the westerly end thereof. The exact size of those openings and the head available at that dam are not fully revealed by the evidence in the case.
*23 In 1847 one Merrick and others, owners of the land on the easterly side of the Oswego river and adjoining the Oswego canal at the easterly end of the aforesaid dam, made application to the canal commissioners for permission to use the surplus water at the easterly end of said dam and to construct such works as might be necessary to enáble them to use such surplus water for hydraulic purposes on such plan and with such restrictions as said commissioners might deem necessary and proper.
Thereupon the said board of canal commissioners passed a resolution as follows:
“ Resolved, that permission be granted respectively, to the above named applicants, pursuant to Chapter 316 of the Laws of 1839, to use surplus water flowing over said dam, at the places above mentioned, on condition that said surplus water shall be drawn in the manner and on the plan represented in a diagram and specifications, which diagram and specifications and also the obligations, restrictions and conditions with which such permission is granted, shall be fully set forth and signed by the above named applicants respectively, and be severally accompanied with good and sufficient sureties for the faithful performance of said conditions and the observance of said restrictions.
“ Resolved, that before any surplus waters shall be permitted to be used at said dam above mentioned in pursuance of the foregoing resolution, the applicants therefor shall sign the diagram, specifications, obligations, restrictions and conditions, and shall severally furnish the sureties mentioned in the preceding resolution, which diagram, specifications, etc., shall be placed on file in the office of the Canal Commissioners in the new state hall in the City of Albany. ’ ’
Chapter 316 of the Laws of 1839 reads as follows:
“ § 1. The canal commissioners are hereby author *24 ized to permit the ' surplus water flowing over any of the dams on the Oswego river to be used for hydraulic purposes, by the owners of the lands, over or upon which such waters may flow, under such regulations and restrictions as they may impose, and subject to be resumed, in whole or in part, whenever they shall think proper, without any right of the persons receiving such permission to claim any damages or compensation for such resumption; but such permission shall not be given to use any water on the levels of the said canal, nor the water at the dam nearest the village of Oswego.”
That act was later on incorporated in the Canal Law and exists there to this day as the law of this state. § no.
What is known as the Merrick mill at the easterly end of this dam was built in 1847 and continued to draw water from the dam for power under the permit as granted above by the canal commissioners down to 1864, when the mill burned. Since that time no water has been utilized at the easterly end of this dam for power.
Between 1866 and 1871 the original state dam at Minetto was replaced by the state with a new stone dam about ten or fifteen feet north of the original dam. This is known and referred to in this case as the 1870 Minetto dam. This 1870 dam was from eight to twelve inches higher than the original dam which preceded it. It had three twenty-foot openings in its west bulkhead in 1910 through which claimant’s predecessors had draAvn water for power presumably since the construction of that dam. These three openings contained 540.5 square feet of space. This dam had in the wall which the state built between the earthen portion of the berme bank of the canal and the river at the easterly end of the dam, four openings *25 about eight feet high and three feet wide. The cost of constructing these openings was paid for by Moses Merrick apparently for the purpose of using the water allowed to him under the permit of 1847. Such openings, however, were never used by him nor by anybody else.
In 1903 Alanson S. Page and Cadwell B. Benson, predecessors in title to this claimant, claiming to be the owners of the upland at the easterly end of the 1870 dam, applied to the canal board for permission to develop water power at the easterly end of said dam as Merrick had done in 1847. The application was granted and the superintendent of public works was authorized by the canal board to issue a formal permit for such development, the permit to include such restrictions as to the mind of the superintendent of public works shall be necessary for the proper protection of the state’s interests. The permit was issued to said Page and Benson by the superintendent of public works on the 26th day of August, 1903. Among other provisions it contained this language: “ The Superintendent of Public Works reserves the right at any time to revoke and annul this permit and cause said Page and Benson, at their own cost and expense, to remove the additional structures, herein authorized, from off State land; also, the right on the part of the State of re-entry and re-occupation of such lands covered by this permit as the free and perfect use of said Oswego river at any future time may require, or as may be necessary for making any repairs, improvements or alterations in the same.”
Said Page and Benson never availed themselves of this permit. In about 1900 the crest of the 1870 dam was raised about 1.25 feet, which gave it an elevation of 297.3 feet Barge canal datum. The square feet of openings in this dam below this elevation through *26 which water could be drawn was as follows: West end 540.5 square feet. East end 120 square feet.
Prior to 1908 the Minetto Shade Cloth Company had a plant at the west end of the 1870 dam operated by water power by means of a hydro-electric plant in the bed of the river below the dam drawing water through the 540.5 square feet of opening above mentioned. They were then and there developing by means of this water at the head available at that dam, being about 8% feet without flashboards and 10% feet with flash-boards, about 400 horse power. In 1908 the Minetto-Meriden Company purchased the plant of the Minetto Shade Cloth Company. The Minetto-Meriden Company spent about $100,000 in improving the hydroelectric plant, materially improving its efficiency and capacity.
This was the situation which the state found at this point when it began preparations to construct the Barge canal as the legislature had provided in chapter 147 of the Laws of 1903.
Negotiations commenced in January, 1910, between the representatives of the Minetto-Meriden Company and different state officials, including the superintendent of public works, the state engineer and members of the canal advisory board concerning the plans for Barge canal construction at and near Minetto. The Minetto-Meriden Company told the state officers that if the state plans benefited them and gave them ample opportunity to develop their water power, they would waive any damages and in addition would give the state the use of their side track and a piling space. These negotiations continued until April, 1910, when, at the request of the superintendent of public works, the representatives of the Minetto-Meriden Company went to the office of the attorney-general, where the document known, in this case as the waiver and release *27 of April 14, 1910, was drawn up in the form agreed upon by the attorney-general and the representatives of the Minetto-Meriden Company. This document was “ approved as to form ” by the attorney-general, executed by the Minetto-Meriden Company and delivered to the canal board on April 14, 1910. On April 24,1910, the canal board adopted a resolution in reference to this waiver and release in the following form: “ The Secretary presented the agreement of the Minetto-Meriden Company with the State in connection with the improvement of the Oswego canal within the boundaries of proposed Barge Canal Contract No. 37. Upon motion, the above agreement was ordered received and placed on file.” Said waiver and release was never executed by any person on behalf of the state of New York. It is known as Exhibit No. 126 in this case, and is in the following form:
“ This Agreement, made and entered into this 14th day of April, 1910, by and between The Minetto-Meriden Company, a corporation organized under the Laws of West Virginia and licensed to do business in the State of New York, party of the first part, and The State of New York, party of the second part, Witnesseth as follows:
“ Whereas, The Minetto-Meriden Company is interested as Lessee and contract purchaser in a certain manufacturing plant and certain real estate located at Minetto, Oswego county, New York,— the character and extent of said interest and the legal description of said property being as set forth in a certain indenture of lease dated May 20th, 1908, a copy of which, marked ' Exhibit A,’ is hereto attached;
“And Whereas, The State of New York proposes to construct the new Barge Canal improvement in the Oswego River between Fulton and Oswego in accordance with the general plan, prepared by the State *28 Engineer, and described and set forth in the resolutions approving same, adopted by the Advisory Board of Consulting Engineers on the 22nd day of March, 1910, of which said resolutions a copy marked ‘ Exhibit B ’ is hereto attached;
“And Whereas, the State of New York proposes to construct said Barge Canal improvement at Minetto in such manner as not to unnecessarily interfere with The Minetto-Meriden Company’s operation of its said manufacturing plant;
“And Whereas, the State proposes to appropriate so much of the real estate described in said lease as may be required for the dam, lock, bulkhead, dike and other necessary canal works at Minetto; also an easement in the nature of a right of way not exceeding twenty feet wide extending from said new lock to the public highway on the west side of the Oswego river, known as the West River Road;
“And Whereas, the construction of said Barge Canal improvement in the manner hereinbefore provided will destroy or damage certain other property included in said lease, including the hydraulic power plant at the existing Minetto dam, and the buildings known as the sizer building and warehouse No. 1;
“And Whereas, The Minetto-Meriden Company claims an interest or ownership in the waters impounded or to be impounded and to the bed of the Oswego river in front of its uplands at Minetto, which the State does not recognise, claiming to be itself the oivner of the bed of the Oswego river at this point and elsewhere and of all waters, surplus and otherwise, existing and tobe created at all State dams thereon;
“And Whereas, the location of the dam and other works at Minetto pursuant to the plan of said improvements as adopted by the said Advisory Board of Consulting Engineers is, in case The Minetto-Meriden Company should be adjudged the oivner of the surplus *29 waters of the Oswego river at this point, of itself alone a benefit fully equal to the compensation to which The Minetto-Meriden Company would be entitled by reason of the appropriation of, and damage to this property as aforesaid in connection with said Barge Canal;
“And Whereas, the parties hereto are mutually desirous that said benefit of location accruing to the Minetto-Meriden Company as above mentioned shall be offset against and accepted in full payment and satisfaction of said Minetto-Meriden Company’s claim against the State for compensation or damages as aforesaid, in case The Minetto-Meriden Company and not the State of New Yorh shall hereafter be determined to be entitled to use that portion of the water impounded at said new Minetto dam not required for the Barge Canal or purposes of navigation;
“ Now therefore, in consideration that the State of New York will hereafter construct, complete and maintain said Barge Canal improvement in the Oswego river between Fulton and Oswego in accordance with the aforesaid general plan and in the manner herein specified, so long as a canal shall be maintained and operated by the State in said river; and in further consideration of the sum of $1.00 by the State of New York, to The Minetto-Meriden Company paid, receipt whereof is hereby acknoAvledged, it is hereby agreed by and betAveen the parties as follows:
“ 1st. The Minetto-Meriden Company hereby agrees to release the State of New York from any and all claims whatsoever which may hereafter accrue to The Minetto-Meriden Company against the State of New York growing out of the taking or damaging of any of the property described in said lease for the purposes hereinbefore specified, it not being contemplated by the parties that any right, title or interest Avhich the Minetto-Meriden Company may be adjudged to *30 have in the surplus waters of the Oswego river shall be appropriated by the State.
‘ ‘ 2nd. The Minetto-Meriden Company further agrees to protect, indemnify and save harmless the State of New York against any and all claims of parties other than The Minetto-Meriden Company, growing out of the taking or damaging of any of the property described in said lease for the purposes hereinbefore specified.
‘ ‘ 3rd. The Minetto-Meriden Company further agrees to furnish to the State of New York upon request a good and sufficient indemnifying bond executed by said Minetto-Meriden Company as principal and by the Columbia Shade Cloth Company and some good and responsible Surety Company as sureties, in form satisfactory to the State, and in such penal sum not exceeding $50,000.00 as the State of New York may require for the indemnity and protection of the .State of New York against said above mentioned claims and each of them.
‘ ‘ 4th. The Minetto-Meriden Company further agrees to permit the State of New York and its Contractor or Contractors to use free of charge the switch track connecting its plant with the D., L. & W. R. R. Co.— said switch tracks to be used in common with the Minetto-Meriden Company and their Contractors and subject to such reasonable restrictions as the Minetto-Meriden Company may from time to time impose for the common benefit of all.
' ‘ 5th. The Minetto-Meriden Company further agrees to permit the State of New York and its contractor or contractors to use free of charge in connection with said construction work at Minetto, a piling space for materials of two acres, or such additional space as the State Engineer may consider necessary adjacent to said switch tracks and conveniently located for said construction work — the specifications for said con *31 struction work to provide that all rubbish should be removed by the contractor from said piling space and the same restored to the Minetto-Meriden Company in a clean condition upon the completion of said work.
“ 6th. It is mutually understood and. agreed that neither the acceptance of this agreement by the State of New York, nor anything herein contained shall be construed or considered as a waiver by the State of its right, hereby expressly reserved and retained, to assert at any time hereafter and in any lawful manner its claim to the exclusive ownership and control of all the water, surplus or otherwise, which has been or may be impounded at Minetto, or as giving to the said Minetto-Meriden Company any interest in or control over any of the structures or public works of the State built or to be built by the State in pursuance of said plan of canal improvement.
“ 7th. It is further mutually understood and agreed that in case the State of New York shall be hereafter determined to be the owner of that part of the water impounded at said new Minetto dam not required for the operation of said Barge Canal or for purposes of navigation, then and in such case, the Minetto-Meriden Company’s right to compensation, hereby released as aforesaid, shall be treated as revived and enforceable against the State.
“ 8th. It is further mutually understood and agreed that in case The Minetto-Meriden Company shall be hereafter determined to be the owner or entitled to the use of that part of the water impounded at said new Minetto dam not required for said Barge Canal or for purposes of navigation, and in case also the State of New York shall hereafter make any change in the Crest elevation of any of the dams at or below Minetto, and shall thereby reduce the head of water created at said new Minetto dam in accordance with said above mentioned general plan of the State Engi *32 neer, then and in such case, the Minetto-Meriden Company shall have the right to consider said reduction of head of water as a new and further appropriation of its property by the State for which it shall be entitled to compensation.
" 9th. In case the said Barge Canal improvement should not be made and completed in accordance with the general plan set forth in said ‘ Exhibit B ’; or in case the final location of the dam, lock, bulkhead and dike at Minetto, the width of space provided at said point for power development and the provisions of the said specifications designed to minimize the interruption to the Minetto-Meriden Company’s existing hydraulic power plant shall not be accepted as satisfactory to it by the Minetto-Meriden Company within five days after the State Engineer’s plans and specifications for said work shall be completed and submitted to the Minetto-Meriden Company, then and in either such case, this agreement shall be null and void.
“ In witness whereof, The Minetto-Meriden Company has caused its corporate name to be hereunto subscribed by its Vice-President and its corporate seal to be hereunto affixed and the same to be attested by its Secretary.
‘' The Minetto-Meriden Company,
" [seal] By W. H. Lyon,
“Attest: Its Vice-President.
“ S. Gr. Wilkins,
“ Its Secretary.-
“ Approved:
“ James B. Keogh,
“ T. D. McChesney,
“ S. G-. Wilkins,
“ W. R. Hees,
“ W. H. Lyon,
“ Committee
*33 The state then proceeded to make its appropriations and commence its new construction at this point. On January 4, 1911, the state appropriated from claimant’s grantors one-quarter of .an acre of land on the westerly bank of the river known as parcel No. 2878. On or about July 25, 1912, the state also appropriated all the right, title and interest, if any, of claimant’s grantors in a portion of the bed of the Oswego river within the boundaries of claimant’s property upon which to build the new dam, lock, bulkhead, etc. This appropriation is known as No. 2910-A and includes No. 2910 and covers about 11.88 acres of the river bed at that point. The notice of appropriation includes this language: “ The rights, if any, of the Minetto-Meriden Company and the Minetto Shade Cloth Company, and each of them, to use the surplus waters of the Oswego river not required for the Barge Canal or for purposes of navigation are hereby expressly excluded from this appropriation. Nothing herein shall be construed, either as an admission by the State that any such rights exist, or as a waiver by the State of its claims to the exclusive ownership of the entire bed of the Oswego river, and of all the waters, surplus or otherwise, existing or to be created at all State dams thereon
After many conferences between the state engineer in charge of Barge canal construction at Minetto and Mr. McChesney as representative of the Minetto-Meriden Company, the final plans were adopted by the state for this improvement and were apparently made as contemplated by the provisions of the waiver and release above set forth and known as Exhibit No. 126.
The state contractor then shut off the water from the old hydro-electric plant of the Minetto-Meriden Company about July, 1912, by means of a coffer-dam. *34 The state then proceeded to construct its new dam at this point. The new dam has a crest elevation of 308 Barge canal datum instead of 297.3 Barge canal datum, which was the crest elevation of the dam which preceded it. The new dam is about 100 feet south of the site of the 1870 dam. It has a lock through the center for the passage of boats, instead of at the easterly end. The 1870 dam had about 540.5 square feet of openings in the bulkhead at the west end of the dam through which the Minetto-Meriden Company was drawing water, whereby it claims to have developed about 500 horse-power. This claimant is drawing water now through about 3,000 square feet of openings in the bulkheads at the westerly end of the new dam, where, at about 17% foot head instead of an 8% foot head, it is developing about 12,000 horse-power by means of its new hydro-electric plant built at an expense of about $650,000 to take advantage of the new head created by the new state dam, and from which it derives an annual income of $120,000. This construction of this new power plant was commenced in the fall of 1914 and it was opened for permanent operations about October 1, 1915. From July, 1912, until claimant could use its new power plant in 1915, its manufacturing plant was operated by a temporary steam plant.
The completed Barge canal structures at Minetto were constructed by the state in accordance with the plans above mentioned.
Soon after the state contractor commenced work at Minetto, and on December 24, 1912, the Minetto-Meriden Company filed its claim herein demanding damages by reason of the appropriations made by the state and consequent upon the state’s operations at this point, in the sum of $1,285,887. The said company stated in such claim regarding the waiver and *35 release of April 14,1910, as follows: ‘ ‘ That the filing of this claim is not to be construed as an attempt by claimant to disaffirm, or in any way affect said release of damages and grant of privileges, but that this claim is filed for the purpose of securing and preserving to this claimant its right to prosecute and maintain its said claim against the State of New York in case the State shall hereafter abandon its above-mentioned plan for the canalization of that portion of the Oswego River covered by said Barge Canal Contract No. 37, or shall hereafter modify said plan in such manner as to effect an annulment of said release pursuant to its terms.”
Such in brief is the history of the state’s and the claimant’s connections with the Oswego river at Minetto.
The legal rights of the state and of the claimant in the premises can easily be determined, as it seems to us, by reference to three cases decided in this court, two of which have been affirmed by the Court of Appeals. Those cases are: Bulger v. State of New York, 18 C. C. Rep. 6; 15 State Dept. Rep. 2. No appeal was ever taken from this decision. Pratt v. State of New York, 2 State Dept. Rep. 356; affd., 172 App. Div. 914; 219 N. Y. 554; motion for reargument denied, Id. 635; Fulton Light, Heat & Power Co. v. State of New York, 13 C. C. Rep. 285; 65 Misc. Rep. 263; affd., 138 App. Div. 931; 200 N. Y. 400.
The principles laid down in these cases having the sanction and approval of the court of last resort, are controlling upon us so long as they remain unchanged, and must of necessity be adopted and followed by us in all similar cases.
Those principles, it seems to us, are strictly applicable to the case at bar. Applying the law as thus established to the facts as presented by the evidence *36 in the case now before us, we reach the following conclusions:
First. Before the building of the original Oswego canal, which was commenced in about 1826, claimant’s predecessors in title on either bank of the Oswego river at Minetto, owned the upland, and in connection therewith and as riparian owners, also the bed of the river to the center or thread of the stream. They were vested with the ordinary rights of a riparian owner consisting not only of ownership of the bed of the river, but also of the right to use the water of the stream.
Into this situation came the state in about 1826. It built a dam directly across the river, destroyed the wing dam on the westerly side of the river and built a canal with a lock in a land cut around the easterly end of the dam. We are now to determine,
Second. What rights in the river and to the waters of the river at this point did claimant’s predecessors in title possess after the appropriation made by the state for the building of the original Oswego canal?
In endeavoring to answer this question we are met with the same difficulties which Judge Bodenbeck encountered in the Fulton Light, Heat & Power Company Case, supra. His answer to them there meets the situation here. He says: “ In determining what these rights are, this court must follow the adjudications heretofore made by the courts as it finds them and not formulate any new doctrine. The rights of the parties must be determined by reference to the facts and the established decisions of the courts. The difficulty of determining the rights of the parties since the appropriations by the State for the old Oswego canal lies in the fact that no grant of land or water rights affecting these premises was made under the act of 1816 (ch. 237), and no appraisement was made pursuant to *37 the act of 1817 (ch. 262), and as there are no living witnesses to recount the actual transactions as they occurred at that time, reliance must be had upon the acts of the parties themselves, interpreted in the light of such documentary evidence as is available. One of the facts that assists in determining the rights acquired by the State and those that remained in the claimants is the statute under which the rights of way for the original canal were acquired. This statute, enacted in 1817, provided that the State might acquire such land and water as might be ‘ necessary ’ for the canal ‘ doing nevertheless no unnecessary harm.’ (L. 1817, ch. 262.) It seemed to be the intention of this act that only such rights should be acquired by the State as were necessary for the proposed canal, and that in acquiring those rights no unnecessary harm should be done; but there is no grant or award showing what rights the State regarded as necessary, and recourse must be had to what was actually done. * * *
“ When it began the construction of its canal in 1825, claimants’ predecessors were in possession of the uplands and owned the fee of the bed of the river. The State removed the wing dam, extending nearly to the center of the river, and in its place substituted a dam built across the river, furnishing a head of about twelve feet. It connected by a pier the east end of the dam with the east high bank of the river, allowed claimants’ predecessors to rest their saw mill upon this pier and placed openings in the pier for the supply of water to the mill and also to the old wooden flume which previously existed. * * *
“Although the appropriation made by the State was not followed by an appraisement as required by the statute of 1817 (ch. 262), the State acquired the right to use so much of the water of the Oswego river as was necessary for the operation of the canal, reserv *38 ing for the claimants’ predecessors such portion of the remainder of the water as ivas available through the openings which it left in the pier. It was evidently thought at the time by claimants’ predecessors that this supply of water, with the additional head furnished by the new dam, would compensate them for such damages as they sustained; and it does not appear that any effort was made, either by them or by the State to secure an appraisement. Any objection arising from the absence of. a grant or appraisement has long since been cured, and the title of both parties has become fixed by lapse of time. * * *
“ Obviously it was not deemed necessary by the State to take from the claimants’ predecessors all of the water of the Oswego river. This would have been accomplished had the State constructed the dam and pier from bank to bank, without openings for the mill and flume; and had this course been taken by the State, the claimants would not be in a position to insist that the State in building the barge canal should provide openings for the surplus water of the river. * * *
“If no openings had been left at the time of the appropriation, it might very well be claimed that the use of the water by the claimants was a mere license from the State; but under the circumstances it seems clear that the right to maintain the openings is a permanent one, growing out of the appropriation made when the canal was constructed and confirmed by subsequent acts. * * *
“ Claimants’ predecessors were compensated for the water rights which they lost when the wing dam was destroyed by the State by the appropriations made for the old canal which allowed them to draw water from the river under the increased head provided by the new dam. Without this provision they would not have been in a position as of right to claim *39 the benefit of any increased head created by the erection of a dam higher than the original wing dam. Any power thus created belonged to the State, and they were not at liberty to draw upon this power without making a return to the State.”
It seems clear, therefore, that after the building of the original dam at Minetto by the state claimant’s predecessors in title possessed no rights whatever to use the water at the easterly end of said dam for power because no openings were left in the easterly end of the dam.
It seems apparent also that claimant’s predecessors in title on the westerly bank of the river were confined to the use of such portion of the water of the river as could be passed through the openings left in the bulkhead at the westerly end of the dam at the head made available by the original crest elevation of said dam.
Thus the rights of claimant’s predecessors in title in and to the use of the waters of the Oswego river opposite to their property became fixed for all time unless later enlarged upon. And as so fixed, unless later enlarged by a grant from the state, they exist today. The grantee can have no greater rights than those possessed by his grantor.
The exact size of the openings in the westerly bulkhead of the original dam is not definitely known. It must be presumed, however, that the 540.5 square feet of openings placed in the 1870 dam were made in accordance with the rights of the parties. Such openings it was the legal duty of the state to there maintain for the use of claimant’s predecessors in title and it cannot be presumed that the state acted unlawfully in this regard. Furthermore, the court is confirmed in this view from the fact that claimant and its predecessors in title have had the use without objection *40 for more than forty years of this 540.5 square feet of openings found in the westerly bulkhead of the 1870 dam when the state began Barge canal operations at Minetto in 1910.
The old original state dam at Minetto was destroyed by the state between 1866 and 1870 and a new dam constructed in its place by the state about ten to fifteen feet northerly thereof. This new state dam, known as the 1870 dam, was constructed of stone and had a crest elevation from eight to twelve inches higher than the old dam. This new dam was evidently constructed because of the fact that the old original log dam was going to decay and also for the purpose of slightly elevating the surface of the water in the pool above it. It does not appear that anything took place at this time to affect the relation of the state and the riparian owners or that their respective rights were in any way changed. Nor does it appear that claimant’s predecessors made any such contention. The crest of this latter dam was raised about the year 1900 one and one-quarter feet, which brought it up to 297.3 feet Barge canal datum. This created an available working head at this dam of eight and five-tenths feet without flashboards and ten and five-tenths with flash-boards. The claimant’s predecessors were permitted to use this increased head without objection by the state. Such user, however, in no way enlarged their legal rights, nor could such user, however long enjoyed, ever ripen into a vested interest. Bulger v. State of New York, supra; Burbank v. Fay, 65 N. Y. 57.
From all the evidence in the case on the subject, we conclude that the original log dam which fixed claimant’s rights here had a crest elevation of about 295 feet Barge canal datum, with an available working head of about 7% feet and 540.5 square feet of openings through the'bulkheads at the westerly end of the dam.
*41 Therefore, it may safely be concluded, as it seems to us, from all the facts in this case and from the law applicable to such facts as clearly set forth in the three cases above alluded to, that the legal rights of claimant’s predecessors in and to the water of the Oswego river at Minetto immediately prior to the commencement of Barge canal construction there in 1910 were confined to such an amount of the surplus waters thereof as could be drawn through the 540.5 square feet of openings in the bulkhead at the westerly end of the dam at a head of 7% feet.
And we are confirmed in this conclusion by the language of chapter 316 of the Laws of 1839, supra (now section 110 of the Canal Law). Also by section 16 of the Barge Canal Law which reads as follows:
“ Sec. 16. Lease or sale of- waters.— The waters, surplus or otherwise, created or impounded as a result of the improvement of the Erie, Champlain and Oswego canals, pursuant to the provisions of this act, or from the construction of any dam or dams, mole or moles, reservoir or reservoirs, or other structures, connected therewith, shall not be leased, sold or otherwise disposed of, until the improvement of said canals as contemplated in this act, and amendments thereto, shall have been finally completed, nor thereafter until authorized by statute setting forth specific terms, conditions and restrictions governing the same.” Added by Laws of 1907, chap. 494.
Also by the opinion of the attorney-general construing said section in the following language: “ That amendment plainly implies that it is the purpose of the State that the disposition of the water powers connected with the canals and navigable streams named shall remain in statu quo until comprehensive' action shall be taken dealing with the enormous value of this water power, in order that the State at large may *42 realize the benefits thereof. To adapt present plans to the use of larger volumes by present users would be unauthorized by present statutes and in violation of the purpose embraced in the amendatory statute last quoted.” Report of Atty. General, 1908, p. 221.
We are further enlightened as to the meaning of this section by the able opinion of Judge Ross in the ease of People’s Gas & Electric Co. v. City of Oswego, 108 Misc. Rep. 247, wherein, at page 256, he uses this language: “ There can be no question that the terms of section 16 are very comprehensive, and were intended to protect, in every respect, the right of the state of New York in and to the waters created or impounded as a result of the improvement of the canals, until such canals were finally completed, and ‘ thereafter until authorized by statute, setting forth specific terms, conditions and restrictions governing the same.’ No claim was made, either upon the argument or in the brief of counsel, that the barge canal is completed, and no evidence has been presented that there has been any subsequent authorization by statute setting forth specific terms, conditions, and restrictions, but, on the contrary, it was stated by the learned counsel for the plaintiff, and not denied, that a bill was introduced in the state senate April 2, 1919, by Senator Ramsperger (senate print No. 1526), which authorized the canal board to compromise, settle and adjust the claims and demands of water power claimants, and provided by its terms that the canal board might, on such terms and conditions as it deemed just, compromise and adjust the claims and demands of persons and corporations as to ownership of water power or any interest in water power. In other words, the aforesaid bill provided in substance for precisely what it is proposed to do in this case. This bill passed both houses of the legislature, and was vetoed by the *43 governor, as I understand, upon the ground that the right to develop this power belongs to the state of New York, and not to the city of Oswego. This is referred to in this connection only for the purpose of showing that evidently, in the judgment of the members of the two houses of the legislature, they deemed such legislation necessary to confer power upon the canal board.
“ There can be no question that the state of New York has the right to use, if required for canal purposes, all of the water of the Oswego river, and the purpose of this section was to protect that right. In other words, this act not only forbids the sale of what is termed ‘ surplus water,’ which goes to waste, but is intended also to protect the right of the state in and to all of the waters created or impounded. Stripped of all verbiage, what the city of Oswego seeks is the right to use all or a portion of the surplus water impounded in dam No. 6. This is what the state proposes to convey. The other transfers in the proposed conveyance by the state are simply incidental and necessary to enable the city of Oswego to use said surplus water. The state, at present, is willing to sell such water. Section 16 of the Barge Canal Act seems to forbid such sale, and if the apparent meaning of section 16 is its actual meaning, then the city of Oswego would part with valuable claims (probably not as valuable as claimed in the notices filed, but of substantial value), like Esau of old, who sold his birthright for a ‘ meal of bread and pottage. ’ ”
All of which seems to have been clearly understood and appreciated by the canal board in its dealings with claimant’s immediate predecessors in regard to the very premises in question as is exhibited in its resolution authorizing a deed of the property on which claimant’s new power house is now situated, wherein *44 it used the following language: “ Nothing herein shall be construed either as an admission by the State that any such rights exist, or as a waiver by the State of its claim to the exclusive ownership of the entire bed of the Oswego river and of all the waters, surplus or otherwise, existing or to be created at all State dams thereon. ’ ’
All of which seems to indicate that the state has consistently followed a uniform policy on the Oswego river from the very inception of canal operations thereon.
Now we are to consider in what manner, if at all, and to what extent claimant’s water rights have been affected by the Barge canal construction and appropriations made by the state since 1910.
The state in making its appropriations for the new canal structures specifically excluded therefrom claimant ’s predecessors ’ rights to use the water of the river in the following express language: “ The rights, if any, of the Minetto-Meriden Company and the Minetto Shade Cloth Company, and each of them, to use the surplus waters of the Oswego river not required for the barge canal or for purposes of navigation are hereby expressly excluded from this appropriation.”.
Claimant’s rights to' use the water of the river, therefore, as originally established so far as the language of the notice of appropriation is concerned, remain untouched.
Nor can it be argued that as a matter of fact, without any regard to this express avowal by the state not to interfere with claimant’s water rights, that the claimant has suffered the loss of any such rights. Not only has the state found it unnecessary to deprive claimant of any water or of any head at which such water could be used, but it now finds itself possessed of a surplus over and above all the rights of the *45 claimant in this regard amounting to an additional head of ten feet and an additional amount of water measured by the amount capable of being passed through 2,459.5 additional square feet of openings on the westerly bulkhead of the new dam. And with this fact the claimant is perhaps better acquainted than anybody else, because it has been permitted to use this additional water and additional head without objections. And since the construction of the new Barge canal dam at Minetto it not only has been in the full enjoyment of all the remuneration which could be secured from a hydro-electric plant operated by the amount of water that could be passed through 540.5 square feet of opening in the dam at a head of 7% feet capable of developing about 500 electric horsepower, but in addition during all that time it has had the use and enjoyment of -about 11,500 electric horsepower which we must conclude, if we are to be guided by the law and authorities applicable thereto, belongs to the people of this state.
Third. We are of the opinion, therefore, that claimant’s water rights, that is, its rights in and to the use of the surplus waters of the Oswego river, have been in no way impaired or diminished by the Barge canal operations and appropriations made in connection therewith and for the purpose thereof at Minetto, except as they were temporarily interfered with during the construction of the dam. That those rights are the same today as before the destruction of the 1870 dam, no greater and no less.
We now come to the consideration of the two preliminary questions propounded to the court on the 9th day of January, 1918, and upon which the respective counsel have filed voluminous briefs.
The first question is: ‘ ‘ Whether or not the so-called waiver and release of April 14, 1910, which is an ex- *46 Mbit in the case,- is a valid instrument, and if so, the operation and legal effect of that instrument.”
Upon an examination of this instrument we find that it is predicated upon the establishment of three preliminary propositions:
A. The payment to the Minetto-Meriden Company of one dollar by the state of New York.
B. The construction and maintenance of Barge canal improvement in the Oswego river between Fulton and Oswego in accordance with the general plan prepared by the state engineer as set forth in the resolutions adopted by the advisory board of consulting engineers on the 22d day of March, 1910.
C. That the Minetto-Meriden Company and not the state of New York shall hereafter be determined to be entitled to use that portion of the water impounded at said new Minetto dam not required for the Barge canal or purposes of navigation.
• The receipt of the one dollar by the Minetto-Meriden Company is acknowledged; the Barge canal improvement between Fulton and Oswego was constructed and is being maintained as contemplated by the resolution of the advisory board of consulting engineers referred to; but this court cannot determine that the Minetto-Meriden Company is entitled to use all the water impounded by the new Minetto dam not required for the Barge canal or purposes of navigation.
Therefore, as one of the three conditions upon which said waiver and release is predicated is wanting, we must hold that it is, therefore, inoperative. Whether we could say that it “is a valid instrument ’’ if all of these three preliminary conditions were met and complied with, it perhaps is unnecessary for us to determine at this time. We believe, however, there can be no harm in expressing the opinion that it would be impossible for this claimant, and would have been impos *47 sible for any of its predecessors in title, to obtain a vested interest in the new state dam at Minetto or any portion of it through or by any such instrument as the waiver and release of April 14,1910, known as Exhibit No. 126 in this case.
The second question as to the nature and extent of claimant’s water rights and privileges at this time we have already answered.
Inasmuch as we hold that the said waiver and release is inoperative because the preliminary conditions on which it is based have not been met, it has no bearing on our answer to the second question.
It may not be out of place for us to indicate at this time that we consider the theory advanced upon the trial by the claimant, and upon which much of its proof was offered, that but for the state appropriation No. 2910-A in the bed of the Oswego river the claimant would be at liberty to construct a dam across the river below the state dam and back the water up against the state dam and other state structures, is absolutely untenable. Judge Fennell, late of this court, stated the law on that proposition very clearly and as we understand the same to be in the case of Bulger v. State, supra, as follows:
“ It must be held, therefore, that in cases where the State has actually appropriated the situs of a power dam, destroyed the owner’s dam, and erected its own in place thereof, the State has taken all water elevation rights of that owner above the foot of the down-stream face of such dam, and no structure erected by the owner so backing up water against the State dam is thereafter lawful. The riparian owner’s power possibilities that attached to the water leaving the State dam are those creatable from the foot of the dam to the down-stream end of the owner’s uplands fronting on the river.
*48 “ The power owner took his rights in the new dam by agreement,— which agreement is evidenced by the existing status thereafter. The power owner’s rights became 'fixed as of that time, and have not and cannot grow with the advance of the science of water power development, except as such development can be applied to the limited flow permitted by the openings through the State dam into his headrace, and the head maintained by the dam. The power owner’s rights, as against the State, can never be greater than they were under the status maintained for so many years. The power owners accepted certain openings, heads, regulations of elevations, State construction and State maintenance of dam, etc., in payment for their rights interfered with. Thereafter, their rights were contractual rather than riparian, and they cannot grow and expand with the science of hydraulic development except as above stated.”
The able and skillful attorney for the claimant endeavors to prove that because the claimant’s predecessors were entitled to use all the water they could draw through the openings left in the old dam at the head available at that dam, that they are, therefore, entitled to use all the water they can draw through the greatly enlarged openings in the new dam at' the new head.
We have endeavored to point out the manner in which we now reach the conclusion that claimant’s predecessors were' entitled to use only the water that could be drawn through the 540.5 square feet of opening in the original dam at the head of 7% feet available at that dam. Such right, under the doctrine of the Fulton Light, Heat & Power Company case, is based upon the presumption that it was the consideration given by the state and accepted by claimant’s predecessors as payment for their water-power rights *49 when the state tore out their wing dam in about 1826 and erected its own dam for the canal. And such i's now the legal presumption because we have no record of any appraisement following the original appropriation ; because we have no record of the compensation which the state agreed to pay claimant’s predecessors for taking away their wing dam and destroying their water power other than the dam itself; because we have no witnesses who can testify to the actual transactions as they occurred at that time. We must, therefore, as was said in the Fulton Light, Heat & Power Company case, “ have recourse to what was actually done.” The original dam structure, therefore, becomes the record of this transaction. This record discloses the right, and all of the right which claimant or any of its predecessors have had since the state constructed its first dam, or now have to the use of the surplus waters of the Oswego river at this point. And it does not appear that claimant’s predecessors down to the time of Barge canal construction ever contended that they had any greater rights. Claimant has never been entitled to use all the surplus waters of the river not necessary for the canal or for the purposes of navigation simply because its grantors were limited to such portions of that surplus as will pass through 540.5 square feet of openings in the dam at a head of. 7% feet, and none of them, therefore, could convey any greater interest. .
The state in 1826 took all of the water-power rights of claimant’s predecessors except as above stated. The consideration above mentioned as having been given by the state was given for all such water-power rights of claimant’s predecessors. Neither the claimant nor any of its predecessors have ever been deprived of any part of such compensation except temporarily. That right now held by this claimant has never been invaded by the state. It was expressly *50 excluded from the appropriation for the Barge canal. It is possessed and enjoyed by this claimant untouched by the state, intact and unimpaired. For what, then, must the claimant now be compensated? Absolutely nothing, except for the value of its land appropriated by the state and for the damages it suffered by reason of the temporary and necessary interference with its water power while the state was constructing its new dam.
The claimant has suffered no other damage. The state has taken nothing else from it. The claimant seems to proceed upon the almost inconceivable theory that after the state took the water-power rights at the premises in question and compensated the then riparian owner for the same in about 1826, it must make a repayment for such rights to the grantee of such riparian owner who happens to be in possession whenever it builds a new dam.
There is, of course, no foundation for such a theory as this either in morals or in law. Whenever the state invades, acquires, or destroys any of the waterpower rights given to claimant’s grantor in about 1826 in consideration for and as compensation for the destruction by the state of such rights as the said grantor possessed at that time, then, and not till then, is any grantee of such grantor entitled to any further compensation from the state for water rights. That time has not yet arrived. It is true that the state has never conceded that the claimant or its predecessors have ever been in possession of any such rights as we herein have found them to be entitled to. We believe, however, that the state is plainly in error in this regard.
; The state has always contended that it owned not • only the bed of the river, but all the surplus waters at Ithese dams on the Oswego river. This contention of *51 the state has been exhibited in various acts of the legislature; in revocable permits given for the use of surplus water; in the language of the notices of appropriation at this very point for the purposes of the Barge canal; in chapter 316 of the Laws of 1839, now section 110 of the Canal Law; in section 16 of the Barge Canal Act; in the resolution of the canal board authorizing the conveyance to claimant of the property upon which its new power house stands; and in the very language of the waiver and release of April 14, 1910, itself, wherein the paragraph numbered 6 reads as follows: “ It is mutually understood and agreed that neither the acceptance of this agreement by the state of New York, nor anything herein contained shall be construed or considered as a waiver by the state of its right, hereby expressly reserved and retained, to assert at any time hereafter and in any lawful manner its claim to the exclusive ownership and control of all the water, surplus or otherwise, which has been or may be impounded at Minetto, or as giving to the said Minetto-Meriden Company any interest in or control over any of the structures or public works of the state built or to be built by the state in pursuance of said plan of canal improvement.”
All of which is reiterated by the state in its brief filed in this case and in which it avails itself of the reservation last above referred to.
The last reassertion by the state of its claim to the absolute ownership and dominion over the bed of the Oswego river and waters impounded by the dam in question is expressed in the following language to be found on pages 152 and 153 of the aforesaid brief, to wit:
“ Briefly stated, the State contends that:
“ (1) The title to the bed of the Oswego river at the locus in quo never passed out of the State, with the *52 result that claimant’s predecessors in title never possessed any water rights or privileges therein.
“ (2) Assuming, for the argument, that the State’s patents to the adjacent upland carried title to the thread of the river, the State by the appropriations made pursuant to Chapter 279, Laws of 1824, and subsequent acts, acquired title to the bed of the pool above the State dams, including all water rights or privileges appurtenant or incident to said land, and also the right to the use of all of the surplus water of the river at the head rendered available by the State dams.
“ (3) The claimant’s predecessors in title never acquired any property right or interest in the use of any part or portion of the waters impounded by the 1826-7 or the 1870 State dams. * * *
“ (4) Assuming, for the argument, that the rule laid down in the Fulton case is applicable, the water rights and privileges of the Minetto-Meriden Company in 1908 were limited to the use, at the head afforded by the original 1870 dam, without flash-boards, of so much water as would find its way through the openings in the west end of the dam.
‘ ‘ The crest of the dam was raised in 1897 and 1900 from 296.0 to 297.3, but claimant’s predecessors obtained no vested or property right or interest in the resulting increase in head.
“ Likewise claimant’s predecessors in title acquired no right to have flashboards maintained upon the dam, so that claimant’s rights in 1908 were limited to a dam with crest at 296.0, which would render available a head in the neighborhood of 7 feet.
“(5) That claimant’s rights in the new dam are no greater than the rights of its predecessors in the 1870 dam.”
The record, therefore, does not disclose that there *53 has ever been any declaration by any state officer, by the legislature, or by the courts that would indicate that the claimant is entitled to any greater rights than its predecessors formerly possessed at the 1870 dam as herein set forth. Claimant cannot contend, therefore, that it built its new power house under any representations from any constituted authority that its rights were about to be enlarged upon as it now contends for.
The waiver and release of April 14, 1910, means absolutely nothing at this time so far as having any influence on the determination of the rights of the parties here because it is based on an absolutely impossible hypothesis. It is so drawn as to be absolutely without effect as to the determination of any rights between the parties unless the claimant is found to be entitled to the use of all the surplus water at the new dam. But we find that neither the state nor the claimant is entitled to all the surplus water at the new dam. What the state gave to claimant’s predecessors as compensation for the destruction of its wing dam and power rights connected therewith the state is now powerless to take from it without further compensation. And what claimant’s predecessors received for the loss of its original water rights cannot be added unto except by a further grant from the state, which has never been given. The language we used in Bulger v. State is applicable here:
“ It must be assumed in view of the facts of this ease, and in view of the law as laid down in the case last above cited that these openings and this head were given to claimant’s predecessors in title by the State in lieu of other or different compensation for what rights the State acquired there and took possession of under its rights of eminent domain as being necessary for the proper construction of the *54 Oswego canal. The rights of the parties became fixed, and in the absence of acts of the State still further invading the rights of claimant or its predecessors in the water and bed of the Oswego river, neither the claimant nor its predecessors would be or could be entitled to further benefits from the State.
“ It is true that officers of the State have, since the building of the 1867 dam, increased for claimant both the amount of water it could use and the head at which it could use such water. But in such increased benefits the claimant has had nothing more than what amounts to a revocable license to use; they never could develop into property rights as against the State; and the State was at liberty at any time to withdraw such increased amount of water and head without becoming liable in damages to claimant.”
The suggestion made on the trial that the state would be unable to utilize any of this surplus water even if it should be adjudged the owner thereof, is entirely without force because the people of the state retain the power to make such utilization even assuming that a constitutional amendment be a prerequisite thereto.
The parties may now complete their evidence so that the court can make a final determination upon the completed case.
Webb and Cunningham, JJ., concur.
Ordered accordingly.